**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

James R. Walker,

Plaintiff,

v.

UnumProvident Corporation,
f/k/a Provident Life & Accident
Insurance Company,

Defendant.

Civil No. 01-1795 (DWF/RLE)

**MEMORANDUM OPINION AND ORDER**

---

Stephen W. Cooper, Esq., and Stacey R. Everson, Esq., Cooper Law Office, 800 Ceresota Building, 155 5th Avenue South, Minneapolis, Minnesota 55401, counsel for Plaintiff.

John Harper III, Esq., and Terrance J. Wagener, Esq., Krass Monroe, 1100 Southpoint Office Center, 1650 West 82nd Street, Bloomington, Minnesota 55431, counsel for Defendant.

---

## INTRODUCTION

The above-entitled matter came on for hearing before the undersigned United States District Judge on Friday, September 27, 2002, pursuant to Defendant UnumProvident Corporation's Motion for Summary Judgment.[1] In its Complaint, Plaintiff alleges a breach of contract claim against Defendant, asserting that Defendant failed to pay Plaintiff benefits due under Plaintiff's disability policy when Plaintiff became totally disabled on January 1, 1993. For the reasons stated below, Defendant's motion is granted in part and denied in part.

---

[1] Defendant's motion papers also included a motion to dismiss Plaintiff's claim of bad faith breach of contract pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court need not address this issue because Plaintiff has since withdrawn this bad faith claim.

FILED OCT 28 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## BACKGROUND

Plaintiff is a medical doctor diagnosed with serious sexual disorders that leave him unable to control his impulse to expose himself to females. Terminated from his long-standing job as a family practice doctor because of this inability to control himself and diagnosed with Sexual Disorder-N.O.S. and Paraphilia-N.O.S., Plaintiff petitioned his occupational disability insurer, Defendant UnumProvident Corporation, for benefits. After UnumProvident denied his request, Plaintiff brought an action for breach of contract against the company. The specific facts that lead to this suit follow.

### 1. Plaintiff's Employment History and Allegations of Misconduct

Plaintiff, Dr. James R. Walker, began his practice in family medicine at the Mork Clinic in Anoka, Minnesota, in 1973. Plaintiff apparently had a successful practice until 1991, when Mork Clinic discovered that Plaintiff had been performing unnecessary and inappropriate pelvic and breast exams on female patients. Many of the allegations leveled against Plaintiff during his time at the clinic form a similar pattern: without bona fide medical indications for a breast or pelvic exam, Plaintiff would inappropriately assist in undressing the female patient, examine her without a gown, stare at her breasts, handle her breasts, and, many times, perform a pelvic exam that involved lingering and inappropriate touching. Plaintiff did not chart these "exams."

To deal with this misconduct, Mork Clinic initially required that Plaintiff have a chaperone present in the examining room when he examined female patients. This chaperone system ended in approximately July 1992, but was reinstated in September 1992 after allegations of another inappropriate examination by Plaintiff on a female patient.

Apparently due to this continued misconduct, Mork Clinic terminated Plaintiff, effective December 31, 1992. The clinic also reported his misconduct to the Anoka County authorities

and the Minnesota Board of Medical Practice. In April 1993, the Anoka County authorities charged Plaintiff with seven counts of criminal sexual conduct in the third degree and nineteen counts of criminal sexual conduct in the fourth degree. Plaintiff pleaded guilty to three counts of third degree criminal sexual conduct, for which he was sentenced to 15 years probation, community service, sexual offender treatment, and one year in the Anoka County jail with work release.

On January 28, 1994, the Complaint Review Committee of the Minnesota Board of Medical Practice commenced a disciplinary proceeding against Plaintiff. The Committee alleged that Plaintiff had abused 21 female patients during 1991 and 1992. By its January 21, 1995, Findings of Fact, Conclusions and Order, the Board of Medical Practice suspended Plaintiff's license, but stayed a suspension against him provided that he comply with certain conditions: he was to practice in a group setting, he was to complete a program for sexual offenders at the University of Minnesota, and, most notably, he was not allowed to treat female patients. Plaintiff completed the sex offender program at the University of Minnesota between 1993-1995.

Between 1993 and 1999, Plaintiff was employed sporadically. His jobs included moving and cleaning vehicles for an automobile leasing business, reviewing medical records for medical malpractice and personal injury cases, and performing physicals for male truck drivers. During this time, Plaintiff petitioned the Minnesota Board of Medical Practice for reinstatement of his ability to treat female patients. His request was denied. Because Plaintiff continued to struggle with his inappropriate sexual impulses, Plaintiff was unable to return to a position in medicine where he could treat female patients.

Throughout Plaintiff's treatment for these sexual disorders and with sentencing looming overhead for the crimes that he committed, Plaintiff was also exposing himself to women,

despite the obvious negative consequences that would inevitably result from such behavior, and even in settings where he was not treating patients. Plaintiff exposed himself to the mother of a fellow patient at Alpha House, the inpatient sexual treatment facility where Plaintiff was living between January 1999 and January 2000, resulting in his discharge from the facility. Plaintiff exposed himself to a librarian during his community service work at the Sherburne County Historical Society. Plaintiff exposed himself to his office secretary. By Plaintiff's own admissions, he exposed himself to up to hundreds of women over approximately the past 30 years.

In March 2000, Plaintiff was charged with additional counts of indecent exposure, criminal sexual conduct, and probation violations, and was sentenced to 82 months in prison. On March 28, 2000, Plaintiff's license to practice medicine was revoked.

Plaintiff is currently incarcerated at the Moose Lake Correctional Facility in Moose Lake, Minnesota.

**2. Plaintiff's Medical History**

Plaintiff began receiving medical treatment for his psychological issues from a variety of doctors, beginning in 1991. This treatment began even before Plaintiff was terminated from his position and continued at least until he was incarcerated.[2] The initial diagnoses of Plaintiff include that he suffered from boundary issues, depression, and anxiety. Notably, Plaintiff began treatment with Dr. Thomas Gratzer in 1998, who finally diagnosed Plaintiff as suffering from generalized anxiety disorder, major depressive disorder, Sexual Disorder–Not Otherwise

---

[2] While it is unclear to the Court what treatment Plaintiff currently is receiving in prison, Defendant's expert witness Dr. Rauenhorst stated in his deposition that Plaintiff is "participating in what treatments are available."

Specified, and Paraphiliac Disorder–Not Otherwise Specified. Sexual Disorder N.O.S. and Paraphiliac Disorder N.O.S. are Plaintiff's primary disabling conditions, according to Dr. Gratzer. Furthermore, according to Dr. Gratzer, Plaintiff's symptoms of Sexual Disorder N.O.S. include "intense, sexually arousing fantasies, urges, and associated sexual behaviors that cause significant distress or impairment." Dr. Gratzer testified in his deposition that Plaintiff's sexual-related disorders began as early as 1992 or 1995.

**3. The Policy**

Plaintiff purchased consecutive occupational disability policies from Defendant or its predecessor organizations beginning in 1973 (collectively, the "Policy"). He kept the Policy up-to-date through the year 2000. Under the Policy, Plaintiff was entitled to monthly benefits if he became totally disabled. The Policy Definitions read as follows:

> **Sickness** means sickness or disease which is first manifested while your policy is in force.
>
> **Total Disability or totally disabled** means that due to Injuries or Sickness:
>
> 1. you are not able to perform the substantial and material duties of your occupation; and
> 2. you are receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to you.
>
> **your occupation** means the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation.
>
> **period of disability** means a period of disability starting while this policy is in force

(emphasis added). Notably, the Policy had no exclusion for injury or sickness that resulted in criminal acts. Furthermore, the Policy only exempted pre-existing conditions for which the

policyholder had received treatment within the five-year period prior to the effective date of the Policy.

The Policy also provided instructions for filing a claim:

> NOTICE OF CLAIM
> Written notice of claim must be given within 20 days after a covered loss starts or as soon as reasonably possible. The notice can be given to us at our home office, Chattanooga, Tennessee, or to our agent. Notice should include your name and the policy number.
>
> PROOF OF LOSS
> If the Policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.
>
> If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.

Plaintiff submitted his claim for disability benefits on March 17, 2000, alleging that he became totally disabled on January 1, 1993.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and

inexpensive determination of every action.'" Fed. R. Civ. P. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Plaintiff's Legal Disability Versus Factual Disability**

"'It is a general rule that disability insurance policies, such as those at issue in the instant case, provide coverage for factual disabilities (*i.e.*, disabilities due to sickness or injury) and not for legal disabilities.'" *BLH ex rel. GEH v. Northwestern Mutual Life Ins. Co.*, 92 F. Supp. 2d 910, 915 (D. Minn. 2000), *quoting Goomar v. Centennial Life Ins. Co.*, 855 F. Supp. 319, 325 (S.D. Cal. 1994), *aff'd*, 76 F.3d 1059 (9th Cir. 1996); *see also* 10 *Couch on Insurance* § 146:9 (3d ed. 1998). Courts have held that where a legal disability such as a license suspension precedes the alleged factual disability, an insured is not entitled to disability payments. *See, e.g.*, *Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688 (2d Cir. 1997) (summary judgment upheld when lawyer's license suspension, not chemical dependency and other alleged disorders, resulted in his inability to work). Defendant alleges that Plaintiff's inability to practice medicine is not a result of sickness, but rather is a result of the restrictions placed upon Plaintiff's work as a doctor and his subsequent incarceration. Defendant claims that Plaintiff is disabled by virtue of a legal, not factual disability, and therefore is not disabled within the terms of the Policy.

The Court finds the reasoning from this District's *BLH* case persuasive on this issue. In *BLH*, assignees of RKH, the insured (who were also minor children abused by RKH), sued RKH's insurance company for payment of benefits under a disability insurance policy that RKH had obtained while working as an anaesthesiologist. *BLH*, 92 F. Supp. 2d at 911-13. The relevant provisions of RKH's disability policy, as stated by the court, were nearly identical to those at issue in the present case. *Id.* at 914.

After being caught sexually abusing his daughter in 1994, RKH pleaded guilty to one count of criminal sexual conduct. *Id.* at 911. Following this guilty plea, RKH further admitted to having had sexual contact with approximately 26 female patients while they were under anesthesia and to sexually abusing several other small children. *Id.* at 912. Nearly two years later, the Minnesota Board of Medical Practice revoked RKH's license to practice medicine due to his misconduct. *Id.* Initially, RKH was diagnosed with depression, but approximately four years later, RKH was diagnosed with multiple paraphilic disorders, including voyeurism, pedophilia, paraphilic disorder n.o.s., and sexual disorder n.o.s. *Id.* at 913.

The insurance company moved for summary judgment, asserting that RKH was unable to work not because of his sickness, but rather due to the legal and professional consequences of his criminal behavior. *Id.* at 915. Finding that a genuine issue of fact existed as to whether RKH's depression and paraphilic disorders rendered him disabled under the policy and thus preceded his legal disability, the *BLH* court denied summary judgment. *Id.* at 916-17. The court stated:

> RKH's secret molestation of patients shows that he was unable to ensure the health and safety of his patients. A reasonable jury could find, as a result, that RKH was unable to perform the principal duties of his occupation, despite his ability to administer anesthetics competently. There is a maxim in medical ethics, often proclaimed as a fundamental principle of the ancient Hippocratic Oath, which suggests as much: 'Above all[,] do no harm.'

*Id.* at 916, *quoting* Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* 189 (4th ed. 1994).

Here, as in *BLH*, a reasonable jury could conclude that Plaintiff was unable to perform the substantial and material duties of his occupation and thus that he became disabled long before his medical license was revoked. It appears to the Court that Plaintiff suffered from a sickness that rendered him unable to ensure the health and safety of his patients, much less that of his female co-workers. While a clear, formal diagnosis of Plaintiff's disorder did not occur until many years after this sickness manifested itself, Plaintiff admittedly had been performing acts consistent with the diagnosis long before he was caught, long before his medical license was revoked, and long before he was incarcerated for his misconduct. Thus, the Court finds that there is a genuine issue of fact as to the time at which Plaintiff became disabled under the Policy and thus as to whether Plaintiff's factual disability, under the terms of the Policy, preceded his legal disability. Thus, summary judgment is inappropriate on this issue.

**3. Plaintiff's Change of Occupations**

Defendant alleges that even if a sickness precluded Plaintiff from employment as a family practice physician, Plaintiff is not entitled to disability benefits under the Policy because he had changed occupations when the disability was uncovered. Because the Court finds that the time at which Plaintiff became disabled is a question of fact, the Court need not address this issue.

## 4. Care of a Physician and Timely Notice of Plaintiff's Claim

Defendant asserts that it is entitled to at least partial summary judgment because, under the terms of the Policy, Plaintiff failed to obtain consistent "care by a physician which is appropriate for the condition causing the disability" and because Plaintiff failed to provide timely notice of his claim.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff did indeed receive consistent, appropriate care beginning in 1991 and thereafter.

However, the Court finds that under a strict reading of the Policy and as a matter of law, Plaintiff is not entitled to benefits prior to one year and 90 days before he filed his notice of claim. The Policy clearly states:

> If the Policy provides for periodic payment for a continuing loss, you must give us written proof of loss within 90 days after the end of each period for which we are liable. For any other loss, written proof must be given within 90 days after such loss.
>
> If it was not reasonably possible for you to give written proof in the time required, we will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible. **In any event, the proof required must be furnished no later than one year after the 90 days unless you are legally unable to do so.**

(emphasis added). Plaintiff first filed notice of his claim on March 17, 2000. Plaintiff has not alleged that he was legally unable to provide proof of his claim until that time. Under the terms of the Policy, Plaintiff is entitled to receive benefits only within the preceding one year and 90 days prior to his notice of claim. Thus, Plaintiff's claim for disability benefits may be considered only as of December 18, 1998.

## CONCLUSION

The parties entered into a contract that stated that Plaintiff would receive a substantial amount of benefits if he became totally disabled from his occupation at the time of the disability.

As offensive to notions of decency and fairness as Plaintiff's conduct may seem, public policy cannot dictate that this Court rewrite the terms of this valid contract. Both parties are bound by the terms of the policies for which they contracted. The Court cannot undo this contract, no matter how repulsive Plaintiff's conduct may seem.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. No. 29) is **DENIED IN PART** and **GRANTED IN PART** as follows:

   a. Defendant's Motion for Summary Judgment is **DENIED** with respect to Defendant's claim that Plaintiff is not disabled within the terms of the Policy.

   b. Defendant's Motion for Summary Judgment is **GRANTED** with respect to Defendant's claim that Plaintiff failed to provide timely notice of his claim. Plaintiff's claim may be considered only as of December 18, 1998.

Dated: October 25, 2002

DONOVAN W. FRANK
Judge of United States District Court